# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 04-CV-3771 (JFB)

---

MCQUEEN DOUGE,

Plaintiff,

VERSUS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

Defendant.

---

MEMORANDUM AND ORDER
May 18, 2006

---

JOSEPH F. BIANCO, District Judge:

Plaintiff McQueen Douge brings this action pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3), challenging the final decision of defendant Commissioner of the Social Security Administration (the "Commissioner" and the "SSA," respectively) that Douge was not entitled to disabled adult child's insurance benefits under the Social Security Act (the "Act"). The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), requesting that the Court affirm her findings. Plaintiff opposes defendant's motion and cross-moves for a remand for further administrative proceedings. For the reasons set forth below, defendant's motion is granted, and plaintiff's cross-motion is denied.

I. BACKGROUND AND PROCEDURAL HISTORY[1]

A. Prior Proceedings

On October 1, 1996, Douge filed an application for supplemental security income ("SSI") alleging disability due to a spinal cord injury. (Record at 12.)[2] The injuries were sustained in a car accident on July 17, 1996. (*Id.* at 14.) The October 1, 1996 claim was

---

[1] The background and procedural history are primarily drawn from the pleadings and the administrative record in this case.

[2] References to "Record" are to the certified administrative record of proceedings related to this case.

denied initially and on reconsideration, and Douge did not appeal further. (*Id.*) On September 28, 1998, Douge filed a new application for SSI and was awarded disability benefits. (*Id.*)

In January 2003, Douge's case was reevaluated and the SSA determined that he was no longer disabled. (*Id.*) Douge's benefits ceased in March 2003. Douge disagreed with the SSA's determination and filed a request for a hearing on February 4, 2003. (*Id.*) Douge alleged that he was still disabled due to an injury to his knee and lower back. (*Id.*) On May 13, 2005, a hearing was held and Douge appeared and testified without an attorney. (*Id.*)

After describing the plaintiff's background, the Court will review the medical history, followed by the administrative law judge's (the "ALJ") findings.

### B. Plaintiff's Age, Education, and Experience

Douge is a thirty-two year-old high school graduate. (*Id.* at 323.) Douge has completed a six-week computer school in anticipation of taking the "A plus test" and becoming a "PC technician." (*Id.*) Douge is not currently working, but, prior to getting injured, he worked as an assistant audio engineer. (*Id.* at 327.) Douge has applied for several jobs, and also plans to attend college. (*Id.* at 326.)

### C. Non-Medical Evidence

Plaintiff worked as a cashier from 1992 - 1994. (*Id.* at 98.) In 1995, he attended school for music recording and, from January 1996 through July 1996, Douge worked as a runner/assistant in a recording studio in California. (*Id.* at 65, 77.) The administrative record contains different statements from Douge about the physical requirements of his job at the recording studio. In one section, Douge states that he sat for about two hours, stood for about five hours, and walked for about one hour every day. (*Id.* at 78.) In another section, he states that he stood and walked for about seven hours and sat for one hour every day. (*Id.* at 97.) Further, Douge has stated that he lifted up to fifty pounds, and lifted twenty-five pounds frequently, but he also stated that he lifted up to 100 pounds. (*Id.* at 67, 97.) In another part of the record, Douge writes "n/a" for lifting and carrying. (*Id.* at 78.)

Douge claims that he continues to be disabled due to injuries to his knee and lower back. (*Id.* at 38, 87.) He claims limited ability to move, difficulty walking, and difficulty doing heavy tasks. (*Id.* at 41, 90, 92, 325, 328, 330-31.) Douge does not have problems with his personal needs and is able to do light household chores. (*Id.* at 41, 90-91.) He has friends, but mainly stays home, and reads and works on his computer. (*Id.* at 41, 91, 328.) Plaintiff does not drive and indicated at one point that he uses public transportation, although at the hearing he claimed that he does not use public transportation. (*Id.* at 91, 329.)

In both April 2002, and when he testified at the administrative hearing, Douge stated that he no longer receives treatment for his injuries. (*Id.* at 88, 324, 331.)

### D. Medical Evidence Submitted at the Hearing

#### 1. Treatment Records Prior to September 1998

##### a. Treatment at UCLA Medical Center

Douge was in a car accident on July 17, 1996, and was treated at UCLA Medical Center for multiple injuries. (*Id.* at 136-96.)

He suffered several injuries, including a left pneumothorax, L5 spinous fracture, sacropelvic dissociation, right inferior pubic ramus fracture, left sacral fracture, right distal tibial fracture, and a retroperitoneal hemorrhage. (*Id.* at 158.)

Douge underwent immediate surgery and was admitted to intensive care for further evaluation. (*Id.* at 158-59.) As a result of Douge's injuries, he had little movement of either lower extremity and underwent surgery for stabilization of the sacrum and pelvis, and underwent reduction and internal fixation of the sacropelvic dissociation. (*Id.* at 159.) Douge had another surgery to place a rod in the right tibia and a Stienmann pin into the calcaneal cuboid joint on the right. (*Id.* at 136.)

Douge was treated by the orthopedics team at UCLA. (*Id.*) During his stay at the hospital, Douge exhibited anxiety and difficulty sleeping, and a psychiatric consult was requested. (*Id.*) The psychiatric team determined Douge likely suffered from adjustment disorder with anxious mood and he was started on Trazadone. (*Id.*)

Two days before Douge was discharged from the hospital, he had strength in his quadriceps of two out of five bilaterally, and zero or one out of five for muscles distally. (*Id.*) Douge was discharged on August 5, 1996, and sent to a rehabilitation facility. (*Id.*) The discharging physician advised that Douge should not sit up beyond sixty degrees, and that he would require additional surgery for removal of the rods and Stienmann pin, as well as extensive physical rehabilitation for his spinal cord injuries. (*Id.* at 137.)

b. Rehabilitation Center Treatment

Douge remained at a rehabilitation center from August 5 until August 29, 1996. (*Id.* at 209-74.) Initially, Douge had grade three muscle strength to L3 on the right and grade four muscle strength to L3 on the left. (*Id.* at 209-10.) During this time, Douge was taken off Trazadone and started taking Doxepin for post-operative depression, severe adjustment disorder, and neurogenic pain. (*Id.* at 210.) Douge underwent various tests and treatments while at the rehabilitation facility. (*See generally id.* at 197-274.) At the time of his discharge, x-rays of the right calcaneus showed a healing subacute comminuted fracture that was satisfactorily aligned. (*Id.* at 197.) Douge's wounds had healed, there was muscle atrophy of the right leg and bilateral foot drop, sensation was intact at S1 and S2 bilaterally, and at S3 on the right. (*Id.* at 197-98, 212.) Sensation was absent at S3 on the left and S4 - S5 bilaterally. (*Id.* at 212.)

On August 29, 1996, Douge was discharged from the rehabilitation center in stable condition with prescriptions for Doxepin, Darvon, Colace, and Senokot. (*Id.*) His activity level was as tolerated with no weight-bearing on his right leg. (*Id.*) Douge's discharge diagnosis was incomplete L4 paraplegia. (*Id.*) Douge's diagnosis was expected to improve when his weight-bearing status changed and as he continued his rehabilitation. (*Id.*)

On September 3, 1996, Douge was seen by a social worker and the social worker encouraged Douge to attend physical therapy despite discomfort. (*Id.* at 208.) The following day Douge informed another occupational therapist that he declined therapy due to its distance from his house. (*Id.* at 207.) The therapist gave Douge a telephone number for a facility nearer to him. (*Id.*)

3

On September 24, 1996, Douge returned to the rehabilitation center for an outpatient follow-up. (*Id.* at 200-06.) The tests revealed that Douge was progressing, although it was also noted that he was depressed, not eating, and having trouble sleeping. (*Id.* at 205.) Douge did not want to see a psychologist. (*Id.*) Plaintiff was to follow-up with another visit a month later, but there are no further reports from the rehabilitation facility.

c. Douge's Consultive Examinations

On November 9, 1996, Douge was examined by an orthopedist. (*Id.* at 279-85.) Douge complained of pain in his shoulder, wrist, back, and leg. (*Id.* at 279.) At this time, Douge was not on any medications but required the use of a catheter every four hours. (*Id.*) Douge was in a wheelchair and unable to walk, but he was not in acute distress, and his neck, elbow, and wrist ranges of motion were normal. (*Id.* at 281-82.) His range of motion in his shoulders were normal bilaterally, but he complained of pain. (*Id.*) After a complete examination, the orthopedist concluded by summarizing Douge's injuries and complaints of pain, and noting that Douge had severe weakness in the lower extremities and could not walk. (*Id.* at 285.)

On November 14, 1996, Douge was examined by a psychiatrist. Douge complained of stress, nightmares, nervousness, and sleeplessness. (*Id.* at 275.) Douge was well-developed, well-nourished, alert, oriented, neatly dressed and well-groomed, and had normal speech. (*Id.* at 276-77.) Douge, however, was in a great deal of pain. (*Id.* at 276.) Although Douge appeared of average intelligence, he had intact memory, ability to concentrate and make abstractions, insight, and judgment. (*Id.* at 276-78.) The psychiatrist assessed that Douge should (1) be able to understand, remember, and carry out simple and complex instructions; (2) respond appropriately to co-workers, supervisors, but possibly not to the general public; and (3) have no problems responding appropriately to a usual work setting in such matters as attendance, safety, and changes in the work routine. (*Id.* at 278.)

2. Treatment in Connection with Douge's 1998 Application

On November 7, 1998, Douge was examined by Dr. Mario Mancheno. (*Id.* at 294-98.) Douge complained of lumbosacral and leg pain, and weakness and numbness in both legs. (*Id.* at 294.) Douge said that the pain was relieved with Tylenol, an ankle brace, and rest. (*Id.*) Douge said that he stayed at home most of the time, and did not do his own shopping, cooking, or cleaning. (*Id.*)

During the examination, Douge appeared alert, oriented, and not in acute distress. (*Id.*) He had difficulty raising from a chair, dressing and undressing, and getting on and off the examining table. His gait was unsteady, with waddling on the left leg. His posture was poor, and he kept his knees semi-flexed. He had a limp favoring his left lower extremity, and had difficulty with toe-heel and tandem walking. (*Id.*)

Douge did not have a loss of lordosis in his neck, and his neck did not have masses, bruits, rigidity, or spasticity. (*Id.*) Douge had full range of motion of the upper extremities, normal grip strength and normal fine manipulation abilities. He did not present with any cyanosis or clubbing of the fingers. (*Id.*) Douge had full range of motion of the hips, knees, and feet. (*Id.* at 294-95.) Douge's ankles were not swollen, but there was tenderness in the medial and lateral aspect bilaterally. (*Id.* at 295.) Douge had five plus out of five muscle strength in the upper extremities, and he had two plus out of

4

five strength in the lower extremities and muscle atrophy of the calf muscles. (*Id.* at 295.) X-rays of the lumbosacral spine revealed probable bilateral L5 laminectomy, bilateral surgery with lag screws across sacroiliac joint, mild tilting of the pelvis downward on the left side and probable bladder stones. (*Id.* at 297.) X-rays of the right leg revealed a healed fracture of the tibial shaft with internal fixation and virtually no deformity. (*Id.*) X-rays of the right foot revealed a healed fracture of the calcaneus with considerable deformity and post-traumatic arthritis. (*Id*. at 298.)

Dr. Mancheno concluded that plaintiff suffered from severe limitations lifting and carrying, standing and walking, pushing and pulling, and moderate limitations sitting. (*Id*. at 296.) He further noted evidence of radiculopathy, neuropathy and muscle atrophy with motor impairment of the ankles. The pain and substantial limitation of motion of the lumbosacral spine was due to the sequella of surgery and discogenic disorder. (*Id.*)

3. Evidence Related to Medical Cessation

Douge was seen by a psychiatrist for a brief period in 2002 for insomnia, but was not under any treatment. (*See* Record at 88, 309, 311, 324.)

a. September 12, 2002, Consultive Examination Report

On September 12, 2002, Douge was examined consultatively. (Record at 299-308.) Douge stated that he had worked as a supervisor a year earlier. (*Id.* at 299.) Douge stated that he still had a nerve injury and atrophy of leg weakness and poor sensation from his car accident. (*Id.*) Douge stated that his back was "okay," but that he had problems with his left knee. (*Id.*) He denied any "injection" or physical therapy, and indicated that he was not taking any medication. (*Id.*)

Douge described heavy drinking problems in the past, but denied that he had liver problems, black out spells, delirium tremors, or seizures. (*Id.*) Douge stated that he suffered from insomnia, but denied that he was depressed. (*Id.*) Douge stated that he helped with shopping and cooking, and generally spent his day working with computers. (*Id.*) He estimated he could walk two blocks. (*Id.*)

Douge appeared fairly developed and nourished, and wore braces on both ankles. (*Id.* at 298-99.) There was no clubbing, cyanosis, or edema of the extremities. (*Id.* at 300.) He had atrophy of both legs with circumferences around the calf measuring nine and a half inches on the right and nine inches on the left. (*Id.*) Douge walked with a slight limp, and had slight difficulty transferring from seated position to and from the examining table. (*Id.*) He had full use of both hands and arms in dressing and undressing, and he had complete finger and hand dexterity. (*Id.*) He had full ranges of motion without deformities in his spine and joints. Douge had a surgical scar over the thoracic and lumbar spine, and flexion was to sixty degrees. (*Id.*) Douge had some hyperpigmentation of the ankles, and flexion and extension were to ten degrees. (*Id.*) Ankle jerks were absent, and muscle strength in the lower extremities was three out of five. (*Id*.) Neurologically, Douge was alert and oriented, and his cranial nerves were fully functional. (*Id*.) Douge's straight leg raising was to sixty degrees, and cerebellar functions were intact. (*Id*.)

Douge was assessed for status post multiple injuries from a motor vehicle accident with history of pelvic fracture, lumbar spine fracture, right tibia fracture, and

5

nerve injury with absent ankle jerk, atrophy of the legs bilaterally, arthralgia of the knee, insomnia, and history of alcohol abuse. (*Id.* at 301.) Douge was found to have no limitations on his ability to sit, had mild to moderate limitations on his ability to stand and walk due to weakness of the leg and arthralgia of the knee, and mild to moderate limitations on lifting and carrying due to weakness of legs, and arthralgia of the knee. (*Id*.)

### b. September 27, 2002 Psychiatric Examination Report

On September 27, 2002, Douge was examined consultatively by a psychiatrist. (*Id*. at 309-10.) Douge stated that he had no history of psychiatric hospitalization, but stated that earlier in 2002 he saw a psychiatrist for a few weeks for insomnia. (*Id*. at 309.) Douge stated that he generally felt anxious and depressed since his motor vehicle accident, and that he drank heavily, but did not abuse drugs. (*Id.*) The report indicates that Douge was casually dressed, neatly groomed, and had good hygiene. (*Id.*) He was cooperative and did not appear to be in acute distress. (*Id.*) Douge's speech was coherent, relevant, and without thought disorder. (*Id.*) Douge's affect was fairly well modulated, friendly, and appropriate, and he was neither depressed nor manic. (*Id*.) Douge did not have hallucinations, delusions, suicidal ideation, or ideas of reference or paranoid trends. (*Id.*)

Douge's intellectual functioning was average, and he was able to reproduce geometric shapes and do simple arithmetic adequately. (*Id*.) Douge's insight and judgment were fair, and his attention and concentration were adequate. (*Id*.) His fund of information, as well as his memory recall, were adequate. (*Id.*)

Douge reported that he lived with his mother, had pets at home and maintained social contacts with friends. (*Id.*) He further stated that he had over ten jobs lasting anywhere from several days to several months at a time, but stopped working due to pain from his injuries. (*Id.*) He also stated that he had worked as long as two years as a recording technician, and that he liked to play a keyboard and listen and record music at home. (*Id.* at 310.)

Douge's psychiatrist opined that Douge had satisfactory ability to understand, carry out and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers, and work pressures in a work setting. (*Id.*) He diagnosed Douge with adjustment disorder of adult life, anxiety and depression to a mild degree, alcohol dependence, and history of post-concussion disorder on Axis I, and no diagnosis on Axis II. (*Id*.) The psychiatrist believed that Douge might benefit from psychiatric treatment and an alcohol program. (*Id*.)

### E. State Agency Opinion

On January 16, 2003, a state agency medical consultant reviewed the record and concluded, *inter alia*, that plaintiff was able to lift twenty pounds occasionally, and ten pounds frequently, stand and/or walk about six hours in an eight-hour work day, sit eight hours, and had unlimited ability to push and pull. (*Id.* 20, 21, 312-15.) The ALJ referenced the Agency Opinion's conclusions as additional support for his findings. (*See id.* at 15.) Although the Agency Opinion is not signed, plaintiff did not object to the Agency Opinion's conclusions, nor did he submit contrary evidence as part of the record, or at the hearing. (*See id.* at 318.) Under such circumstances, it was proper for the ALJ to consider that Opinion. In any event, as discussed herein, the record contains

additional uncontroverted and substantial evidence supporting the ALJ's decision. *See Curry v. Apfel*, 209 F.3d 117, 123-24 (2d Cir. 2000); *see also According Weight to Non-Examining Source Opinions*, 3 SOC. SEC. LAW & PRAC. §37:102 (March 2006) ("[O]pinions of state agency medical . . . consultants . . . can be given weight only insofar as they are supported by evidence in the case record . . .").

### F. The ALJ's Decision

The ALJ issued his decision on June 3, 2004, finding that Douge's disability ceased in January 2003, and his entitlement to supplemental social security payments ended effective March 31, 2003. (*Id.* at 19.) After laying out the applicable law and making factual findings, the ALJ found, *inter alia*, the following:

(1) that Douge "was found to be disabled . . . beginning September 28, 1998," and "has not engaged in substantial gainful activity since that date."

(2) that Douge "currently has the following medically determinable impairments: status post multiple injuries after motor vehicle accident in 1996 with a history of a pelvic fracture and fracture of the lumbar spine and right tibia, osteoarthritis, nervous system injuries and an adjustment disorder."

(3) that "[t]hese medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4."

(4) the "medical evidence establishes that there has been improvement" in Douge's condition as of January 2003, and that this improvement relates to Douge's ability to work."

(5) "The medical evidence establishes that the claimant currently has an impairment or combination of impairments which is severe."

(6) After considering the testimony and evidence, finds that as of January 2003, the ALJ found that Douge "has the residual functional capacity to sit for prolonged periods . . ., stand or walk for short periods . . ., and can carry objects weighing up to ten pounds on an occasional basis. He has some limitations on completing complex tasks, but has no limitations in completing simple tasks. The claimant can perform a wide range of sedentary work."

(7) After considering Douge's age, education, and work experience, and his capacity for sedentary work, the ALJ found that Douge "is not disabled."

(*Id.* at 19.) In reaching his findings, the ALJ considered "the entire hearing record," as well as Douge's "written statements and testimony." (*Id.* at 16.)

### F. Procedural History

Plaintiff filed a *pro se* complaint in this case on August 13, 2004, asserting that the ALJ's decision terminating his disability benefits was erroneous and contrary to the law. The case was assigned to the Honorable Nicholas G. Garaufis. Thereafter, plaintiff retained counsel and the parties cross-moved for judgment on the pleadings. On March 23, 2006, this case was reassigned to this Court. On May 12, 2006, oral argument was held.

7

## II. DISCUSSION

### A. Applicable Law

A district court may only set aside a determination by an ALJ which is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotations and citations omitted). Furthermore, "it is up to the agency, not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

For purposes of disability insurance eligibility, a person is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The claimant bears the initial burden of showing that his impairment prevents him from returning to his prior type of employment. *Barry*, 675 F.2d at 466-67; *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981). If he meets that burden, the burden shifts to the Secretary to prove the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical and mental capabilities, but also his age, his education, and his experience and training. *Campbell v. Sec'y of Health and Human Servs.*, 665 F.2d 48, 51 (2d Cir. 1981); *Dousewicz v. Harris*, 646 F.2d 771, 772 (2d Cir. 1981); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

Once the SSA determines that a claimant is entitled to benefits, it conducts periodic reviews to evaluate the claimant's continued eligibility to receive benefits. *See* 20 C.F.R. § 416.994(a). Upon review, if the Commissioner finds that a claimant is no longer disabled, his benefits may be terminated. 42 U.S.C. § 1382(c)(4). Benefits may only be terminated, however, if there is substantial evidence that the claimant's impairment has improved to such an extent that he is now able to engage in substantial gainful activity. *Id.*; *see also Matice v. Comm'r of Social Security*, No. 6:99-CV-1834 (GLS), 2004 WL 437472, at *3 (N.D.N.Y. Feb. 11, 2004).

To ensure that disability reviews are uniform, the SSA follows specific procedures in determining whether an adult's disability continues. *See* 20 C.F.R. § 416.994(b)(5); *see also Veino v. Barnhart*, 312 F.3d 578, 586- 87 (2d Cir. 2002); *Lora v. Massanari*, No. 00 CIV. 8958 (BSJ) (RLE), 2002 WL 655208, at *6 (S.D.N.Y. April 18, 2002). First, the SSA assesses whether the claimant's impairment or combination of impairments meets or equals an impairment contained in the Listing of Impairments. If the claimant does not have such an impairment, the SSA must then determine whether there has been medical improvement in the claimant's condition. *See* 20 C.F.R. § 416.994(b)(5)(ii). "Medical improvement" is defined as any decrease in the medical severity of the claimant's impairments. The SSA determines medical improvement by evaluating "changes (improvement) in the symptoms, signs, and or laboratory findings associated with [a claimant's] impairments." 20 C.F.R. § 416.994(b)(1)(I). In order to make this determination, "the SSA must compare the current medical severity of the impairment to the medical severity of the impairment at the time of the most recent favorable medical decision." *Veino*, 312 F.3d at 586- 87.

If there has been medical improvement, the SSA must decide whether the medical improvement relates to the claimant's ability to work, i.e., whether there has been an increase in the claimant's residual functional capacity based on the impairment that was present at the time of his most recent favorable medical determination. *Batista v. Barnhart*, 326 F. Supp. 2d 345, 352 (E.D.N.Y. 2004). If the claimant's medical improvement is related to his ability to work, the next inquiry is whether in combination of all of the claimant's current impairments are severe. If the claimant's impairments are indeed severe, the SSA must then assess the claimant's current ability to perform substantial gainful activity, considering the claimant's residual functional capacity, past work experience, age, and education. *See* 20 C.F.R. § 416.994(b)(5)(iii)-(vii); *Batista*, 326 F. Supp. 2d at 352.

Any determination relating to the cessation of benefits under 42 U.S.C § 1382c must be made "on the basis of all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition which is presented by the individual or secured by the Commissioner of Social Security." *Batista*, 326 F. Supp. 2d at 353.

B. Application

In opposing defendant's motion and cross-moving for a remand, plaintiff argues that the ALJ failed to obtain adequate evidence to "answer a number of questions." (Pl.'s Mem. at 8.) Specifically, plaintiff argues that the ALJ should have asked plaintiff if he (1) could "walk/stand up to two hours a day," (2) could "lift/carry ten pounds," (3) suffered "from pain which might interfere with his capacity for sustained, competitive employment," and (4) had a way to travel to and from work based on his testimony that he does not take buses or trains. (*Id.*) Plaintiff also argues that it is "truly odd that the ALJ posed not a single question" as to whether Douge experienced pain.[3] (*Id.*) Plaintiff seeks a remand based on the ALJ's alleged failure to properly develop the record or adduce substantial evidence to support his decision. A review of the ALJ's findings,

---

[3] At oral argument, plaintiff's counsel focused on the fact that, at the hearing, the ALJ did not ask Douge about his pain, or about whether he could occasionally carry up to ten pounds. This contention, as well as the other arguments made in plaintiff's opposition and cross-motion, are discussed herein.

9

however, shows that the record was properly developed, and that the decision was based on substantial evidence.

The ALJ found, as to the first step, that Douge's "impairments do not meet or medically equal one of the listed impairments" in Appendix 1, 20 C.F.R. Part 404, Subpart P, Regulation No. 4. (*See* Record at 18.) At the second and third step, the ALJ also found, based on the submitted record, that Douge had medically improved as of January 2003, and that the medical improvement was related to his ability to work. (*Id.*) At the fourth step, the ALJ found that Douge's still suffered severe impairments. (*Id.*) At the fifth step, the ALJ found that Douge had the residual functional capacity to complete simple tasks; sit for six hours, with normal breaks; stand and/or walk up to two hours, with normal breaks; and carry up to ten pounds occasionally. (*Id.* at 19.) The conclusion reached by the ALJ was that Douge was able to do a wide range of sedentary work. (*Id.*) At the sixth step, the ALJ concluded that Douge was not able to return to his past work as a sound engineer. (*Id.*) Finally, the ALJ addressed the seventh step and concluded that, based on Douge's age, high school education, past work experience, and ability to perform a wide range of sedentary jobs, Douge was not under a disability within the framework of Rule 201.27 of the Medical Vocational Guidelines. (*See* 20 C.F.R. Part 404, Subpart P.) The ALJ concluded that Douge's disability had ceased as of January 2003, and that Douge was no longer eligible for disability benefits.

The Court first addresses whether the ALJ properly developed the record, and then whether the ALJ's decision was based on substantial evidence.

1. The ALJ Properly Developed the Record

The Court finds that the ALJ followed the sequential analysis, and adequately developed the record. "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). The duty to develop the record also includes advising the plaintiff, especially if the plaintiff is *pro se*, of the importance of such evidence. *Echevarria*, 685 F.2d at 755; *Jones v. Apfel*, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999).

The Court finds that the record in this case was properly developed. At one point in plaintiff's memorandum, he suggests that "the sole issue is whether the ALJ's decision is supported by substantial evidence," *see* Pl.'s Mem. at 4, and yet later he asserts that "the ALJ did not properly develop the record." (Pl.'s Mem. at 9.) At oral argument, counsel focused on whether the record was properly developed, arguing that based on the fact that the ALJ did not ask plaintiff certain questions relating to his pain and ability to lift up to ten pounds, the ALJ's findings are in error. Plaintiff's argument is that the ALJ had a duty, given plaintiff's *pro se* status and the non-adversarial environment at the hearing, to inquire in more detail about plaintiff's condition. Although the Court agrees that the ALJ did not phrase his questions specifically the way plaintiff would have preferred, such as whether the plaintiff feels pain or can occasionally carry up to ten pounds, the Court disagrees with the proposition that the failure to ask those precise questions requires a remand. As set forth below, the record in this case is fully developed, including as to plaintiff's level of pain and his ability to occasionally carry up to ten pounds. Indeed, there was no evidence submitted by the

10

plaintiff to the contrary. (*See generally* Record at 12-19.)

### a. The ALJ Considered All of Plaintiff's Medical History

This case does not present a situation where Douge was recently treated by a physician whose diagnosis was not included. In fact, Douge testified that he was not under the care of a physician, nor had he been for some time. (*See* Record at 324.). *See Veino*, 312 F.3d at 587; *Perez*, 77 F.3d at 47. Nor does the record indicate an absence of information about Douge's medical diagnosis.

Here, plaintiff was examined extensively by the State agency's physician and psychiatrist, and the ALJ properly considered these experts' explanations in his opinion. *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1994). Significantly, plaintiff submitted no evidence at the hearing disagreeing with the State agency's opinion, or contradicting the opinion of the State agency's physician. As the ALJ repeatedly indicated, he considered not only the physician's reports, but the written submissions, the testimony of plaintiff, and the overall record in the case. (Record at 16.)

### b. The ALJ Properly Developed the Record About Plaintiff's Limitations

The record also shows that the ALJ properly developed the record addressing plaintiff's ability to sit, walk, and occasionally carry up to ten pounds. The ALJ discussed with plaintiff at the hearing the fact that the plaintiff had attended school, planned on attending college, how many blocks he can walk, as well as how long he could sit at any given time. (*See* Record at 324-31.) In connection with this testimony, the ALJ asked plaintiff about applying for jobs, and plaintiff reported that he had applied for jobs doing computer work, describing his limitations in finding a job that he can do "without putting too much strain, on my body, that's not physical – that's not too physical for me." (*Id.* at 326.)

Plaintiff also testified at the hearing about his limitations on walking and being "up [and] around too much." (*Id.* at 328.) In addition, the consultative physician who examined plaintiff inquired about his ability to sit, and the doctor found that plaintiff had regained the ability to stand and walk. (*Id.* at 299-301.) *See Schisler*, 3 F.3d at 568 (proper for ALJ to consider physician's findings).

Plaintiff's counsel argues that it was error for the ALJ to find that Douge can carry objects weighing up to ten pounds on an occasional basis. Nothing in the record, according to plaintiff's counsel, supports this finding. The Court disagrees. The examining doctor found plaintiff to have no limitations on his ability to sit, had mild to moderate limitations on his ability to stand and walk due to weakness of the leg and arthralgia of the knee, and mild to moderate limitations on lifting and carrying due to weakness of legs and arthralgia of the knee. (Record at 301.) This uncontroverted finding, as well as plaintiff's testimony at the hearing about cooking, cleaning, attending school, and his daily life activities, made for a record that was properly developed for the finding by the ALJ that plaintiff can occasionally carry objects weighing up to ten pounds. *See Kamerling v. Massanari*, 295 F.3d 206, 209 n.5 (2d Cir. 2002); *Centano v. Apfel*, 73 F. Supp. 2d 333, 338 (S.D.N.Y. 1999); *see also Booth v. Barnhart*, 181 F. Supp. 2d 1099, 1106 (C.D. Cal. 2002) (ALJ permitted to draw inferences "logically flowing from the evidence") (internal citations and quotations omitted); *Carpenter v. Apfel*, No. C 98-4891 (SC), 2000 WL 973681, at *3-4 (N.D. Cal. July 5, 2000)

(finding doctors' evidence, as well as other evidence in the record, supported a finding that plaintiff capable of doing "light work").

### c. The ALJ Properly Developed the Record Addressing Plaintiff's Pain

Similarly, the medical record, as well as plaintiff's testimony at the hearing, gave the ALJ a proper record to consider plaintiff's pain. *See Rodriguez v. Barnhart*, No. 05 Civ. 3383 (SAS), 2006 WL 988201, at *5 (S.D.N.Y. April 13, 2006) ("[T]he Second Circuit has also held that the ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.") (internal citations and quotations omitted); *Rivera v. Schweiker*, 717 F.2d 719 (2d Cir. 1983) (holding it "clearly permissible for an ALJ to evaluate the credibility of an individual's allegations of pain" in light of all the evidence). The ALJ asked plaintiff several questions about his on-going treatment, daily activities, physical limitations, and social interaction. In addition, the physician's notes indicate several references to plaintiff's on-going limitations due to his injury and discomfort. (Record at 327-30.) Significantly, in the ALJ's findings, he specifically notes that he considered plaintiff's "pain," *see* Record at 14, and later referenced plaintiff's "extreme limitations" due to "experiencing pain." (Record at 16, 327-30.) *See* 20 C.F.R. § 416.929(c)(3) (ALJ to consider myriad of factors when allegations of pain are greater than what can be shown).

### d. The ALJ Properly Developed the Record Addressing Plaintiff's Ability to Use Public Transportation

Finally, the record was also adequately developed as to how plaintiff would travel to work. The ALJ inquired as to whether plaintiff used public transportation, including asking him how he traveled to the hearing itself. (*See id.* at 329-30.) Although plaintiff indicated at the hearing that he did not use public transportation, the record contained other submissions by plaintiff indicating that he did use public transportation. (*Id.* at 17, 21, 329.) It was entirely proper for the ALJ to consider all of the evidence, including prior submissions and the plaintiff's overall testimony, in reaching his conclusion that plaintiff had the ability to travel to work. *See Centano*, 73 F. Supp. 2d at 338 (proper for ALJ to reject claimants testimony about not taking public transportation in light of all the evidence); *Ruiz v. Barnhart*, No. 03 Civ. 10128 (JGK), 2006 WL 1273832, at *7 (S.D.N.Y. May 10, 2006) (finding it proper for the ALJ to make credibility findings of the claimant) (citing cases); *Rodriguez*, 2006 WL 988201, at *5.

Hence, the Court finds that the record was properly developed in this case. Next, the Court considers whether the ALJ's decision was based on substantial evidence.

### 2. The ALJ's Decision was Based On Substantial Evidence

After carefully reviewing the record in this case, the Court finds that the ALJ's decision was based on substantial evidence. *Balsamo*, 142 F.3d at 79. The record supports the ALJ's finding concerning plaintiff's improved medical condition between September 28, 1998 and January 2003. *See Fleming v.*

*Sullivan*, 806 F. Supp. 13, 14-15 (E.D.N.Y. 1992) (citing 42 U.S.C. § 423(f)(1); 20 C.F.R. § 404.1594). The ALJ found that "[p]rior to January 2003, plaintiff had extreme limitations in lifting, carrying, standing, walking, and pushing and pulling due to his impairments and experiencing pain and weakness in his back and legs." (Record at 16.) This is supported by the September 1998 examining physician's opinion. (*Id*. at 294-98.)

The record, however, also supports the ALJ's findings that plaintiff had significant medical improvements in January 2003. The January 2003 examining physician's opinion found that plaintiff had no limitations in sitting, and only mild to moderate limitations in lifting, carrying, standing, and walking. (*Id.* at 16.) Plaintiff was also examined by a psychiatrist, who found plaintiff to have a satisfactory ability to understand, remember, carry out instructions, respond appropriately to supervisors, co-workers, and work pressure in a work setting. (*Id.*) The ALJ also found it significant what was not in the record, namely, that plaintiff had not been hospitalized for any psychiatric problems, nor had he been under the care of a physician. (*Id.* at 16.)

Of course, demonstrating medical improvement is not enough. Before terminating benefits, the ALJ must also find that the improvement is "related to [the claimant's] ability to do work," and that the claimant is in fact able "to engage in substantial gainful activity." 20 C.F.R. § 404.1594(a), (c)(2). Here, the ALJ considered whether plaintiff's medical improvements related to his ability to do work, and found that plaintiff exhibited an ability to "perform at least a simple sedentary job." (Record at 17.) In support of this conclusion, the ALJ considered plaintiff's improved medical condition, as well as his testimony that he had attended computer school, applied for computer-related jobs, and interacted with friends at his home. (*Id.* at 16-17.) Further, the ALJ credited written submissions completed by plaintiff indicating he cooks, cleans, visits friends and neighbors, and travels by subway. (*Id.*)

The ALJ went on to find that, because plaintiff's prior job was not sedentary, he was unable to perform his past relevant work. (*Id.*) Based on plaintiff's age, education, and work experience, however, the ALJ concluded that there are jobs that exist that plaintiff is able to perform. (*Id.* at 17-18 (citing 20 C.F.R. § 416.963.)) Significantly, plaintiff himself indicated in an interview on April 10, 2002, that he felt able to return to work. (Record at 87.)

In sum, the ALJ's findings – (1) that plaintiff's medical condition improved, (2) that this improvement related to plaintiff's ability to work, and (3) that, although he was not able to perform his prior work, there were sedentary jobs available to him – was supported by substantial evidence in the record in this case.

Plaintiff's argument that the ALJ "speculated" that he could "walk/stand up to two hours a day" and that he can "lift/carry ten pounds" is incorrect. The ALJ properly relied on the overall record in the case, including the physician's opinion. *Yancey*, 145 F.3d at 112. That opinion found that plaintiff was able to carry out light work activity. Light work includes the ability to sit, stand, and/or walk six to eight hours in an eight hour work day and the ability to lift up to twenty pounds. *See* 20 C.F.R. § 416.927; Soc. Sec. Ruling 83-10. It is proper for the

ALJ to consider and credit the physician's opinion, especially when there is no evidence to the contrary. *See Yancey*, 145 F.3d at 112 (citing Supreme Court precedent for the proposition that a physician's written report may be received as evidence and "may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant"). Thus, the finding by the ALJ based on the State physician's opinion is not "speculation," but a proper conclusion based on the record in the case. *Id.* at 114; *Clark*, 143 F.3d at 118.

### III. CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the pleadings is granted, and plaintiff's cross-motion is denied. The Clerk of the Court is ordered to close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 18, 2006
Brooklyn, NY

\* \* \*

Plaintiff is represented by Harold Skovronsky, Esq., 1810 Avenue N, Brooklyn, NY 11230. Defendant is represented by Special Assistant United States Attorney Leslie A. Ramirez-Fisher on the briefing, and Assistant United States Attorney Kathleen A. Mahoney at oral argument, Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, One Pierrepont Plaza, 14th Floor, Brooklyn, NY 11201.